Nelson CAREY ON BEHALF OF Craig CAREY, Nelson Carey and Faye Carey, Plaintiffs,

v.

MAINE SCHOOL ADMINISTRATIVE DISTRICT # 17; Board of Directors of Maine School Administrative District # 17; Kenneth Smith; Herbert Adams; Sue–Ellen Myers, Alfred LeClerc, Virginia Rice, Vince Collins, Ronald Kugell, Ronald Springer, Eugene Whitney,

Donald Gouin, Walter Lang, Reginald Dews, Bradley Cummings, James Johnston, Robert Stimson, Suzanne Uhl–Myers, Edward Whittier and Russell Giasson, individually and in their representative capacities, Defendants.

No. 90–0060–P.

United States District Court,
D. Maine.

Dec. 18, 1990.

Thomas F. Hallett, Portland, Me., for plaintiffs.

Jonathan S. Piper, Jill M.P. Allen, Portland, Me., for defendants.

Steven J. Mogul, Bangor, Me., for insurer.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, Chief Judge.

This matter comes before the Court on Defendants' Motion to Dismiss and/or Motion for Summary Judgment, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 56. For the reasons discussed below, the Motion to Dismiss will be granted in part and denied in part, and the Motion for Summary Judgment will be granted in part and denied in part. In addition, the Court is without jurisdiction to decide two of Plaintiffs' claims; therefore, those claims will be dismissed without prejudice.

Defendants have also filed a Motion to Order Plaintiffs to Submit to a Mental Examination, and a Motion to Compel Answers to Interrogatories/Production of Documents. Both of these discovery motions are made moot by this decision and, as a result, will be dismissed.

## I. FACTS AND BACKGROUND

Craig Carey was adopted by Nelson and Faye Carey (hereinafter collectively Plain-

tiffs) when he was four years old. Craig had been the victim of child abuse by his biological parents and was placed in several foster care homes before being permanently situated with the Careys. These traumatic early childhood experiences have caused Craig serious, recurring emotional problems. One manifestation of Craig's emotional disorder is the great difficulty he experiences in adapting to traditional school settings. Although extremely bright, Craig has regularly engaged in "oppositional behavior," including temper tantrums, manipulative treatment of his peers, fantasizing and outrageous story telling, and general negative attention seeking. He is apparently plagued by the belief, born of his abuse and subsequent adoption, that the world is victimizing and threatening him. *See generally* Discharge Summary by Sweetser Children's Home (Plaintiffs' Exhibit No. 1) (hereinafter Discharge Summary); Intake Evaluation by Sweetser Children's Home (Plaintiffs' Exhibit No. 2); Psychological Evaluation, Berwyn Wetter, Ph.D. (Defendants' Exhibit No. 4) (hereinafter Psychological Evaluation); Supplementary Psychological Evaluation Comment, Berwyn Wetter, Ph.D. (Plaintiffs' Exhibit No. 10).

The Defendants herein are the Maine School Administrative District # 17 (hereinafter MSAD # 17), the school district in which Craig was enrolled; the Board of Directors of MSAD # 17 (hereinafter Board or Board of Directors); Dr. Kenneth Smith, the superintendent of MSAD # 17; Dr. Herbert Adams, the principal of Oxford Hills Junior High School where Craig was enrolled; and sixteen members of the Board of Directors of MSAD # 17 (hereinafter Board Members).

Craig's persistent behavioral problems in his local public school required his admission in 1984 for residential treatment at the Sweetser Children's Home. *See* Pupil Evaluation Team Referral (Defendants' Exhibit No. 2); Pupil Evaluation Team Notice, Report, and Associated Materials, May 30, 1984 (Defendants' Exhibit No. 3); Psychological Evaluation; Pupil Evaluation Team Report, June 21, 1984 (Defendants' Exhibit No. 5). Craig successfully completed the third and fourth grades at the Sweetser Home. He attended the Saco Public Schools for the fifth grade under the supervision of the Sweetser Home, and was successful enough in controlling his behavior to be released to the Careys and permitted to return to his home community's public schools for the sixth grade. *See* Discharge Summary; Pupil Evaluation Team Report, May 29, 1986 (Defendants' Exhibit No. 8) (hereinafter PET Report '86). The Sweetser Children's Home recommended upon his release that Craig be placed in a regular classroom, but that he also receive counselling to address his continuing emotional problems. *See* Discharge Summary.

Craig entered the Guy E. Rowe School, an elementary school in MSAD # 17, for the 1986–87 school year. The intention was to "mainstream" Craig in the sixth grade, meaning that he would not be placed in a special education class. *See* Discharge Summary at 3; PET Report '86; Affidavit of Bruce Tyner at ¶ 5 (Defendants' Exhibit No. 10) (hereinafter Tyner Affidavit). The Careys believed that Craig would require some special services to be successful in public school; however, they strongly objected to Craig being placed in a "special education room." Affidavit of Nelson Carey at ¶¶ 7–9 (Plaintiffs' Exhibit No. 31) (hereinafter Nelson Carey Affidavit); Affidavit of Faye Carey at ¶¶ 5–6 (Plaintiffs' Exhibit No. 30) (hereinafter Faye Care Affidavit).[1]

Craig apparently benefitted from the close supervision and careful attention of his sixth grade teacher. Tyner Affidavit at ¶¶ 9–11; Nelson Carey Affidavit at ¶ 7. He

---

1. There is a dispute as to the veracity of the PET report of May 29, 1986 and the intent of the parties who participated in the meeting upon which the report is based. *See* Plaintiffs' Statement of Material Facts to Which They Contend There Exists a Genuine Issue to be Tried at 3–4 (Docket No. 8) (and citations therein). There is no disagreement that all relevant parties concurred that Craig should not be entered into a special education *class;* however, there is disagreement about what additional special education or psychological service, if any, Craig should receive. This dispute is not material to the disposition of any of the claims herein.

received passing grades throughout the sixth and seventh grades, and the beginning of eighth grade. Craig was never placed in special education nor subjected to any special education evaluation during these years. Affidavit of Dr. Kenneth Smith at ¶¶ 5–7 (Defendants' Exhibit No. 12) (hereinafter Smith Affidavit); Tyner Affidavit at ¶ 11; Faye Carey Affidavit at ¶¶ 9–14; List of Craig Carey's Grades (Plaintiffs' Exhibit No. 4).

After Craig entered the seventh grade at the Oxford Hills Junior High School, the Careys requested that Craig's teachers be notified of Craig's behavioral problems. Mr. Carey avers that he met with Craig's teachers three or four months before the incidents which resulted in this action to explain how best to handle Craig during an "emotional tailspin." Faye Carey Affidavit at ¶¶ 5, 7, 16, 17; Nelson Carey Affidavit at ¶¶ 5–10. One result of that meeting was a purported policy of giving Craig "time outs" whenever his behavior in class became disruptive. Faye Carey Affidavit at ¶ 10. Nonetheless, Craig manifested continuing behavioral problems throughout the seventh and eighth grades. *See* Faye Carey Affidavit at ¶¶ 9–14; Chronology of Craig Carey's Behavioral Problems (Plaintiffs' Exhibit No. 6).

The particular incidents at issue herein began on February 2, 1989 when Craig returned a test paper (a blank map of the United States) to his teacher with the word "DIE" written dozens of times across the page and the circled letter "A" drawn into each of the states. The back of the page was similarly covered with the word "DIE" surrounding what appear to be song lyrics. Test Paper (Defendants' Exhibit No. 13); Letter from Superintendent Smith to Careys (Defendants' Exhibit No. 18); Nelson Carey Affidavit at ¶ 11. Mr. Carey was called to the school the next day to meet with Assistant Principal Moore and guidance counsellor Alice DeCato to discuss Craig's test paper. At the suggestion of Ms. DeCato and Assistant Principal Moore, and fearing that his son might harm himself, Mr. Carey agreed to seek professional help for Craig. Nelson Carey Affidavit at ¶ 11; Smith Affidavit at ¶ 5. Mr. Carey

endeavored unsuccessfully to find psychiatric care for his son, and returned to the school on February 10, 1989 to seek assistance from Ms. DeCato and Principal Herbert Adams. Ms. DeCato called the Crisis Unit at Maine Medical Center on Mr. Carey's behalf to arrange for Craig to be examined. Nelson Carey Affidavit at ¶ 11; Affidavit of Dr. Herbert Adams at ¶ 6 (Defendants' Exhibit No. 12) (hereinafter Adams Affidavit); Memorandum from Alice DeCato, February 15, 1989 (Defendants' Exhibit No. 14 & Plaintiffs' Exhibit No. 5). The Crisis Unit determined that Craig was not a danger to himself or others, and released him to his parents' care. Nelson Carey Affidavit at ¶ 11.

Unknown to his parents or school authorities at the time, Craig had brought his father's forty-five caliber semi-automatic handgun and a loaded ammunition clip to school in his bookbag on February 10, 1989. Adams Affidavit at ¶ 9. While walking near a local cemetery after school that same day, Craig allegedly encountered two fellow students to whom he allegedly showed his father's gun. These two students later reported that Craig threatened to shoot someone, perhaps a teacher, and then himself. One of the students allegedly took the ammunition clip from Craig. After some discussion, the two students convinced Craig to join them in attending the school basketball game that afternoon. Statements of Tim Burbank and Adam Chadbourne (Defendants' Exhibit No. 15).

Several students reported seeing the gun during the course of the basketball game, although there is some dispute as to who was holding the gun. *See* Plaintiffs' Statement of Material Facts to Which They Contend There Exists a Genuine Issue to be Tried at 10 (Docket No. 8) (hereinafter Plaintiffs' Statement). *See also* Deposition of Kenneth Smith at 97 (Plaintiffs' Exhibit No. 34) (hereinafter Smith Deposition) ("another" student displayed the gun at the game). A high school age boy allegedly handled the gun at the game and allegedly encouraged Craig to wave the gun around. The other students at the game who claim to have seen the gun reported becoming so

alarmed that they fled the bleachers for the hallway outside the gym. Craig allegedly entered that hallway at some point, albeit without his bookbag or the gun, and allegedly made jokes about shooting people using his fingers as a mock gun. Statements of Kurt Michelsen, Noah Duarte, and David Hamilton (Defendants' Exhibits No. 15 & 16).[2]

On February 13, 1989, Jodi Keniston, a teacher's aide in the school and the parent of one of Craig's eighth grade classmates, reported that her daughter had seen Craig with the gun at the basketball game. Soon thereafter, a teacher reported seeing the ammunition clip in Craig's possession. Adams Affidavit at ¶ 7; Memorandum from Assistant Principal Moore (Defendants' Exhibit No. 17) (hereinafter Moore Memorandum). Craig was quickly summoned into the principal's office and Ms. Carey was called to the school. Before his mother arrived, Craig told Principal Adams that nothing unusual had happened at the basketball game. However, after Ms. Carey was briefed by Assistant Principal Moore and then permitted to see her son, Craig admitted to his mother, in Principal Adams's presence, that he had carried his father's gun and the ammunition clip to school on February 10. Assistant Principal Moore immediately notified Craig and Ms. Carey that Craig would be suspended from school for ten days pending an expulsion hearing. Adams Affidavit at ¶¶ 8–10; Moore Memorandum; Faye Carey Affidavit at ¶ 19.[3] Moore confirmed the ten-day suspension in a letter to the Careys on February 13, 1989, and notified the Careys that a recommendation for expulsion would be made. Letter—Moore to Careys, February 13, 1989 (Plaintiffs' Exhibit No. 15).

On February 17, 1989, Superintendent Smith wrote to the Careys to inform them of Principal Adams's recommendation that Craig be expelled from school "because of his breach of the rules of the school with conduct that was deliberately disobedient or disorderly as defined in Title 20–A, Chapter 101, Section 1001, Subsection 9 and which violated the peace and usefulness of the school." Letter from Superintendent Smith to Careys, February 17, 1989 (Defendants' Exhibit No. 18). The letter also notified the Careys that the MSAD # 17 Board of Directors would meet on February 27, 1989 for the purpose of hearing and taking action on Adams's recommendation. *Id.* The letter explained the expulsion process and invited the Careys to bring to the hearing "anyone else who you feel you would like to have present to speak in Craig's behalf...." *Id.* Enclosed with the letter was a substantial packet of information, which had also been distributed to all the Board Members, regarding the incidents which prompted Adams's recommendation for expulsion. *Id.*

The Board of Directors met in executive session on February 27, 1989 to consider expelling Craig Carey. Superintendent Smith served as the hearing officer. The discussion in the hearing focused primarily on the facts surrounding Craig's possession of the gun at the basketball game. The written statements of the students who allegedly saw the gun were considered, but the students themselves were not produced for questioning. The reports of the school administrators and teachers involved were also considered. *See generally* Transcript of Expulsion Hearing, February 27, 1989 (Defendants' Exhibit No. 18) (hereinafter Transcript). The Careys, unrepresented by counsel at the hearing, were permitted to

---

**2.** The students' statements cited in the accompanying text and the preceding paragraph were not given under oath and are not included in sworn affidavits. The students who witnessed the incident at the basketball game were called together by Principal Adams and Assistant Principal Moore and, according to Adams, volunteered these written statements. Affidavit of Dr. Herbert Adams at ¶ 11 (Defendants' Exhibit No. 11).

**3.** There is some dispute in the evidence, which is not material to the decision of these Motions, with regard to who actually suspended Craig Carey. The foregoing citations identify evidence submitted by both parties that Assistant Principal Moore suspended Craig. But Defendant Adams, in deposition testimony, represented that *he* had informed Craig and Ms. Carey of the suspension at their meeting on February 13, 1989. *See* Deposition of Herbert Adams at 67–72 (Plaintiffs' Exhibit No. 33).

speak, but they were repeatedly rebuffed in their efforts to get the Board to consider evidence of Craig's emotional problems. *See, e.g.,* Transcript at 5, 11; Nelson Carey Affidavit at ¶ 17. In addition, a group of students apparently sought to present Superintendent Smith with a petition and to speak on behalf of Craig at the hearing. The students were allegedly told to leave, the Careys were allegedly never informed of their presence, and the Careys were allegedly denied a copy of the petition. Smith Deposition at 73–79; Nelson Carey Affidavit at ¶ 22.[4]

One Board Member, who is also an attorney, expressed some doubts early in the meeting that the Board possessed the legal authority to expel Craig for possession of a gun on school grounds. The other Board Members apparently did not accept this interpretation of the law. Transcript at 6. In the end, the Board Members voted (sixteen in favor, two opposed, one abstaining) to expel Craig Carey from the Oxford Hills Junior High School.[5] The expulsion decision was based on six findings, as related in a letter from Superintendent Smith to the Careys on February 28, 1989:

(1) On Friday, February 10, 1989, the student [Craig] carried a dangerous weapon (.45 caliber, semi-automatic pistol together with the pistol's clip loaded with live ammunition) in Oxford Hills Junior High School during the school day and in the Oxford Hills Junior High School gymnasium during a basketball game later that day.

(2) The carrying of a dangerous weapon in school is prohibited by school policy as stated in the Oxford Hills Junior High Parent–Student Handbook (page 11 thereof).

(3) By the aforesaid conduct, the student was deliberately disobedient, deliberately

disorderly, and committed an infraction of violence within the meaning of Title 20–A, MRSA, Section 1001.

(4) By the aforesaid conduct, the student violated school policy, under which said conduct is grounds for expulsion.

(5) By reason of the beforesaid [sic] conduct, faculty members, with justification, are concerned for their safety if the student is not expelled.

(6) The expulsion of the student is necessary for the peace and usefulness of the school.

Letter from Superintendent Smith to Careys, February 28, 1989 (Defendants' Exhibit No. 20).

On or about April 1989, the Careys requested that Craig be readmitted to Oxford Hills Junior High School. *See* Letter from Nelson Carey to Smith, April 10, 1989 (Plaintiffs' Exhibit No. 20). The Board, after notice to the Careys and a hearing, refused to readmit Craig to classes in the regular school setting. The Board agreed, however, to lift the expulsion and place Craig on "indefinite suspension," to facilitate the provision of home tutoring and "a program to address [Craig's] socialization needs...." Letter from Superintendent Smith to Careys, May 1, 1989 (Defendants' Exhibit No. 21). Craig apparently was tutored in May, 1989 at MSAD # 17's expense. Home Tutoring Expenses (Defendants' Exhibit No. 23).

On May 12, 1989, Craig apparently attempted to commit suicide. He was admitted to St. Mary's General Hospital on that date after having taken ten Tylenols, two cold pills, and an unknown quantity of dog heartworm pills. Craig remained in the hospital under psychiatric observation until June 12, 1989. *See* St. Mary's General Hospital Discharge Summary (Defendants' Exhibit No. 24); Tri–County Mental Health

---

**4.** A transcript of the hearing was made, but Plaintiffs contend that a substantial portion of the hearing was neither recorded nor transcribed. Plaintiffs suggest that significant information and statements by the involved parties are not now available for review. Faye Carey Affidavit at ¶ 23; Nelson Carey Affidavit at ¶¶ 19–21.

**5.** The Court assumes, without conclusive evidentiary support in the record other than the Transcript, that the sixteen Board Members named as Defendants in this action are those who voted to expel Craig Carey on February 27, 1989. The Court further assumes that the two Board Members who voted against the motion for expulsion, and the one member who abstained from voting, are not parties to this action.

Services Progress Notes (Plaintiffs' Exhibit No. 23). A PET meeting was called on July 6, 1989 to determine how best to address Craig's educational needs. Based on the events of the preceding months, the assembled group[6] determined that Craig could not return to a regular school classroom and would need a residential placement which provided a therapeutic mental health component. Pupil Evaluation Team Report, July 6, 1989 (Defendants' Exhibit No. 25).

At the end of August 1989, the Board of Directors voted unanimously that the PET report of July 6, 1989 had superseded Craig's suspension from school. Letter from Superintendent Smith to Careys, September 5, 1989 (Defendants' Exhibit No. 26). After another PET meeting in September 1989, Craig was admitted to a residential placement in the Pike School in New Hampshire at the expense of MSAD #17. In March 1990, Craig was suspended from the Pike School for "health and safety reasons." William Fullerton Letter to Marjorie Gray (Defendants' Exhibit No. 29); Faye Carey Affidavit at ¶ 26 (Plaintiffs' Exhibit No. 30). After still another PET meeting in April 1990, Craig was placed in a residential program at the Franklin Academy in Sabattus, Maine, again at the expense of MSAD #17. Craig presently resides at the Franklin Academy.

The Careys, on behalf of themselves, and Nelson Carey on behalf of Craig, filed a Complaint in this Court on March 2, 1990 which generally asserts that the Defendants collectively and individually deprived Craig of his constitutional and statutory rights by expelling him from Oxford Hills Junior High School and, in the process, inflicted tortious injury upon Craig and the Careys. Specifically, the Complaint charges that Defendants violated Craig's procedural due process rights guaranteed in the Fourteenth Amendment to the United States Constitution by the manner in which they expelled him; failed to adhere to the substantive mandates of state law when expelling Craig; violated the federal Education of All Handicapped Children Act (hereinafter EAHCA), 20 U.S.C. § 1401 *et seq.*, by expelling Craig for behavior attributable to his emotional disorder; violated the EAHCA by failing to evaluate Craig as a "special needs" student; and violated the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, by expelling Craig solely because of his emotional disability. Plaintiffs seek recovery for these alleged constitutional and statutory violations using the private civil rights action provided by 42 U.S.C. section 1983. In addition, Plaintiffs claim that Defendants intentionally inflicted emotional distress on Craig and the Careys, and that Defendants violated Craig's privacy rights under the Family Educational Rights to Privacy Act, 20 U.S.C. § 1232g. Plaintiffs seek compensatory and punitive damages for each of the alleged constitutional, statutory, and common law violations.

Defendants claim that several of the counts in the Complaint fail to state a claim on which relief may be granted and move to dismiss those counts pursuant to Federal Rule of Civil Procedure 12(b)(6). In the alternative, Defendants argue that they are entitled to summary judgment consistent with Federal Rule of Civil Procedure 56 on any claim which is not dismissed. Defendants have offered a substantial evidentiary record in support of their Motion for Summary Judgment, and Plaintiffs have responded with their own presentation of evidence.

## II. MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT

■ Defendants argue, pursuant to Federal Rule of Civil Procedure 12(b)(6), that several causes of action included in the Complaint fail to state a claim upon which relief may be granted. A motion to dismiss

---

**6.** Attending this PET meeting were Marjorie Gray, MSAD #17's special education director; Nelson and Faye Carey; Melissa Campbell, a classroom teacher; Raymond Bandusky, Maine Advocacy Services; Dr. Richard Seymour, Tri-County Mental Health Services; Ronald Breazeale, a contracted psychologist; Dr. Herbert Adams; Eric Herlan, counsel to MSAD #17; and Walter Buotte, principal of Oxford Hills High School. Pupil Evaluation Team Report, July 6, 1989 (Defendants' Exhibit No. 25).

tests the formal sufficiency of a complaint and other pleadings. When addressing a motion to dismiss, the Court must keep in mind that the Federal Rules of Civil Procedure require only notice pleading, and that all pleadings, therefore, should be read liberally. *Mladen v. Gunty,* 655 F.Supp. 455, 457 (D.Me.1987). Thus, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). Further, the Court is directed to give to the plaintiff a beneficial interpretation of all facts contained in the complaint and accept all the allegations in the complaint as true. *See Miree v. De Kalb County,* 433 U.S. 25, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977).

■ Defendants also argue that they are entitled to summary judgment on each of the counts of the Complaint which is not dismissed. A motion for summary judgment must be granted if:

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). It is not sufficient to show merely that there exists an alleged dispute about the facts. The moving party must show that there is no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The Court of Appeals for the First Circuit has elaborated on this standard:

[T]he movant must adumbrate 'an absence of evidence to support the nonmoving party's case.' *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When that is accomplished, the burden shifts to the opponent to establish the existence of a fact issue which is both 'material,' in that it might affect the outcome of the litigation, *Anderson v. Liberty Lobby, Inc.,*

477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976), and 'genuine,' in that a reasonable jury could, on the basis of the proffered proof, return a verdict for the opponent. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. It is settled that the nonmovant may not rest upon mere allegations, but must adduce specific, provable facts demonstrating that there is a triable issue. 'The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial.' *Mack v. Great Atlantic and Pacific Tea Co.,* 871 F.2d 179, 181 (1st Cir.1989). As the Supreme Court has said:

[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Anderson,* 477 U.S. at 249–59, 2510–16.

*Brennan v. Hendrigan,* 888 F.2d 189, 191–92 (1st Cir.1989) (quoted in *MCI Telecommunications Corp. v. Franklin–Centennial Corp.,* 128 F.R.D. 158, 158–59 (D.Me. 1989)).

Thus, to respond in full to Defendants' Motions, the Court must make three determinations with respect to each count in the Complaint. First, the Court must determine whether a set of facts may exist consistent with the allegations in the Complaint which would permit Plaintiffs to recover on their claims. If no set of facts would permit recovery, the claim must be dismissed. Second, for each count of the Complaint which is not dismissed, the Court must determine whether the parties' evidentiary submissions generate a genuine issue of material fact. Finally, where no genuine issue of material fact exists, the Court must decide whether Defendants are

entitled to judgment on each count as a matter of law.

## III. PROCEDURAL DUE PROCESS UNDER THE FEDERAL CONSTITUTION

■ The admonition that students do not shed their constitutional rights at the schoolhouse gates, *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 505, 89 S.Ct. 733, 735–36, 21 L.Ed.2d 731 (1969), applies equally well to the substantive rights at issue in *Tinker* and the procedural protections at issue in this case:

> The authority possessed by the State to prescribe and enforce standards of conduct in its schools although concededly very broad, must be exercised consistently with constitutional safeguards. Among other things, the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause.

*Goss v. Lopez,* 419 U.S. 565, 574, 95 S.Ct. 729, 736, 42 L.Ed.2d 725 (1975). There is agreement between the parties that Craig Carey was entitled to the protection of the Fourteenth Amendment's due process clause at his expulsion hearing. There is no agreement as to what process was due.

■ Due process is a flexible concept determined by the nature of the interest affected and the context in which the deprivation of that interest occurs. *See Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976). The immutable minimum requisites of due process, however, are notice and an opportunity to be heard. *See Goldberg v. Kelly,* 397 U.S. 254, 267–68, 90 S.Ct. 1011, 1020–21, 25 L.Ed.2d 287 (1970); *Joint Anti–Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 171–72, 71 S.Ct. 624, 648–49, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring); *id.* at 178, 71 S.Ct. at 652 (Douglas, J., concurring); *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct.

652, 656–57, 94 L.Ed. 865 (1950); *Grannis v. Ordean,* 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914). Thus, Craig Carey was entitled, at a minimum, to be given *"some* kind of notice and afforded *some* kind of hearing." *Goss v. Lopez,* 419 U.S. at 579, 95 S.Ct. at 738 (emphasis in original). The flexibility of due process is found in the type of notice which must be provided and the formality and fairness of the hearing which provides the opportunity to be heard.

■ Three factors must be considered in determining the scope of the required protection:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the [state] interest, including the function involved and fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge,* 424 U.S. at 335, 96 S.Ct. at 903. Craig's interest in the continuation of his public school education is great. While it is true that education is not a fundamental right under the Constitution, *see San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 35–36, 93 S.Ct. 1278, 1297–98, 36 L.Ed.2d 16 (1973), it is also true that "education is the very foundation of good citizenship." *Brown v. Board of Education,* 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954). For that reason, the deprivation of Craig Carey's education was a very serious matter which required significant procedural safeguards. On the other hand, there can be no doubt that the school district's interest in excluding a student who brought an automatic weapon and ammunition to school is also great. The state has assigned to these Defendants the responsibility of safeguarding and educating the children who attend Oxford Hills Junior High School. Withdrawing a potential threat to safety and effective education is an important responsibility well within their charge.

The question is thereby reduced to one of balance: what procedures can best guarantee that both of these substantial interests are served. This Court has previously set forth seven minimum requirements which must be observed in student disciplinary hearings to assure the requisite balance:

(1) The student must be advised of the charges against him;

(2) the student must be informed of the nature of the evidence against him;

(3) the student must be given an opportunity to be heard in his own defense;

(4) the student must not be punished except on the basis of substantial evidence;

(5) the student must be permitted the assistance of a lawyer in major disciplinary hearings;

(6) the student must be permitted to confront and to cross-examine the witnesses against him; and

(7) the student has the right to an impartial tribunal.

*Keene v. Rodgers*, 316 F.Supp. 217, 221 (D.Me.1970) (Gignoux, J.).[7]

Plaintiffs make no specific claims, and could not fairly claim, that Craig was denied notice of the charges or evidence against him, prohibited from being represented by counsel, or adjudicated by a biased tribunal. The record clearly reflects substantial advance notice of the charges and the date and time of the hearing, accompanied by a full packet of all the evidence to be considered by the Board at that hearing. Craig and his parents were expressly invited to bring "anyone else who you feel you would like to have present to speak in Craig's behalf...." This invitation cannot be read to exclude any witness or any representative Plaintiffs might have chosen to accompany them at the hearing.

Plaintiffs assert instead that Craig's procedural due process rights were violated by the failure of Defendants to permit Craig an opportunity to present evidence on his own behalf, the failure to make or obtain a complete transcript of the proceedings, and Craig's inability to confront and examine witnesses against him. Complaint at ¶ 46 (Docket No. 1).[8] Failure to permit Plaintiffs to present witnesses, or to confront or examine witnesses against Craig, would constitute a due process violation. The record shows unequivocally on undisputed facts, however, that the Careys were given an opportunity to speak on their son's behalf, and that they were expressly invited to bring any other witnesses they felt would be helpful to their case. Further, the Careys engaged in several dialogues during the hearing with Defendant Board Members and Craig's chief accuser, Defendant Adams.

The record does establish that Plaintiffs were not given the opportunity to cross-examine the students whose statements were used during the hearing. In addition, several students who appeared of their own accord to address the hearing and present a petition were not permitted to speak.[9] These potential due process

**7.** Although the Court spoke on this issue prior to the landmark Supreme Court precedents governing this subject, the Court's decision is consistent with those precedents and, therefore, retains its vitality.

**8.** Plaintiffs' occasionally mix their arguments that Defendants violated Craig's *constitutional* procedural due process rights and his procedural rights under the various statutes at issue in this case. The Court addresses only the constitutional questions in this section of this opinion.

**9.** The record is unclear as to the identities of these students and whether they were merely offering supporting words for Craig or tendering relevant testimony necessary to the decision of the Board. The Court finds no evidence that the students attending the hearing were the same students who provided written statements describing the events of February 10, 1989. It is important to note, as well, that these students were not witnesses produced by the Careys who were rejected on those grounds.

The Court does not hold, as Plaintiffs ask this Court to hold, that Defendants were required, as an essential element of due process, to produce witnesses who would support Plaintiffs' position in the expulsion hearing. Due process merely required that Plaintiffs be permitted to present any witnesses they were able to produce, and that Defendants not wilfully withhold any material evidence necessary to an equitable result. There is no dispute in this record that Plaintiffs did not produce the students who appeared at the hearing to speak on Craig's behalf, and that Plaintiffs did not request that the students be

problems are vitiated, however, because Craig Carey's own confession to his mother and Defendant Adams, unrebutted in this record, eliminates any doubts as to the facts upon which his discharge was based. The students' statements were mere corroboration of Craig's confession. Plaintiffs' inability to cross-examine the students or hear the appeals of the petitioning students could not have, as a matter of law, prejudiced Craig's case sufficiently for this Court to say that a due process violation occurred. *See Keene v. Rodgers,* 316 F.Supp. at 222 ("the evidence of plaintiff's guilt was uncontradicted and was so conclusive that plaintiff can hardly claim he was prejudiced. . . .").

The last remaining claim of a due process violation is Plaintiffs' allegation, which is supported by undisputed facts in the record, that the transcript of the expulsion hearing is not complete. The Court of Appeals for the First Circuit has warned that

> the courts have not and should not require that a fair hearing is one that necessarily must follow the traditional common law adversarial method. Rather, on judicial review the question presented is whether, in the particular case, the individual has had an opportunity to answer, explain, and defend, and not whether the hearing mirrored a common law criminal trial.

*Gorman v. University of Rhode Island,* 837 F.2d 7, 14 (1st Cir.1988). With this warning against compelling the "undue judicialization of an administrative hearing," *id.,* the Court must consider whether a complete verbatim transcript of an expulsion hearing is so necessary to the "fundamental fairness" of an expulsion hearing that its absence violates due process. *See Newman v. Commonwealth of Massachusetts,* 884 F.2d 19, 23 (1st Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1132, 107 L.Ed.2d 1037 (1990).

■■■■■ The absence of a written transcript is generally not considered to be a

ground for reversing disciplinary action, although some record is required. *Gorman,* 837 F.2d at 15. In this instance, there is a partial transcript, a detailed letter from the hearing officer/superintendent of schools detailing the findings at the hearing and the bases for the expulsion, and voluminous documentary evidence supporting those findings and conclusions. A complete transcript would permit a review of the evidence to see if it is sufficiently substantial to support the tribunal's findings and conclusions, and to assess whether any procedural irregularities occurred during the hearing. This information is readily available from other sources. The Court is satisfied that these records are sufficient, as a matter of law, to satisfy the constitutional protections attending a procedurally fair expulsion hearing. As a result, Defendants' Motion for Summary Judgment on the claim of violations of Craig Carey's procedural due process rights, contained in Count I, will be granted.

## IV. VIOLATIONS OF FEDERAL STATUTES

### A.

■■■■ Plaintiffs make several claims that Defendants violated the EAHCA. 20 U.S.C. § 1401 *et seq.* Defendants argue in response that Plaintiffs have failed to exhaust the administrative remedies as required by the EAHCA and, therefore, move to dismiss Plaintiffs' EAHCA claims. The EAHCA requires that states receiving federal funds for the education of children with disabilities must guarantee "all handicapped children the right to a free appropriate public education." 20 U.S.C. § 1412(1). Congress made clear its preference that these federal funds be used to place children with disabilities in the "mainstream" of American public education. As a result, removal of a child from the "mainstream" educational environment is permitted only when education in regular classes cannot be achieved satisfactorily. 20

---

permitted to testify. Further, the record does not suggest that the students were able to offer any material evidence relevant to the issues

surrounding Craig's expulsion. Thus, the undisputed facts on the record do not establish that Defendants violated Craig's due process rights.

U.S.C. § 1412(5)(B). *See Doe v. Brookline School Committee,* 722 F.2d 910, 916 (1st Cir.1983).

When a child is removed from the educational mainstream, section 1415(f) of the EAHCA guarantees that any resulting violations of that child's rights under the statute may be remedied by a civil suit. Before the commencement of a civil suit, however, section 1415(f) requires the exhaustion of the administrative procedures set forth in the other subsections of section 1415. *See* 20 U.S.C. § 1415(b)(2), (c), and (f). *See also Harper v. School Administrative District No. 37,* 727 F.Supp. 688, 689–90 (D.Me.1989). This Court, and other district courts, are merely the culmination of the state administrative appeals process, positioned to hear only those issues preserved for judicial review by proper presentation to an administrative hearing officer. *David D. v. Dartmouth School Committee,* 775 F.2d 411, 422 (1st Cir.1985), *cert. denied,* 475 U.S. 1140, 106 S.Ct. 1790, 90 L.Ed.2d 336 (1986).

The procedures outlined in section 1415 are intended to resolve any issues which arise with respect to the provision of free public education to children with disabilities. *See* 20 U.S.C. § 1415(a). Parents are entitled to an impartial due process hearing, replete with procedural safeguards, conducted by a local or state educational agency unrelated to the agency providing educational services to the child, and review of any decision by an independent decision maker in the state's education agency. *See* 20 U.S.C. § 1415(b), (c), (d). Any party aggrieved by the findings and decisions generated by these procedures may seek judicial review in a state or federal court. Those reviewing courts "shall receive the records of the administrative proceedings," in addition to hearing additional evidence at the request of the parties. 20 U.S.C. § 1415(e)(2).

The only circumstances in which the circumvention of this carefully tailored EAHCA administrative scheme would be permitted are cases where pursuing administrative remedies would be either futile or inadequate. *Honig v. Doe,* 484 U.S. 305, 326–27, 108 S.Ct. 592, 605–606, 98 L.Ed.2d 686 (1988). *See also Smith v. Robinson,* 468 U.S. 992, 1014 n. 17, 104 S.Ct. 3457, 3469 n. 17, 82 L.Ed.2d 746 (1984) (citing 121 Cong.Rec. 37416 (1975) (remarks of Sen. Williams) ("exhaustion of the administrative procedures established under this part should not be required for any individual complainant filing a judicial action in cases where such exhaustion would be futile either as a legal or practical matter")); *Harper,* 727 F.Supp. at 692. Plaintiffs' ability to proceed on their EAHCA claims, therefore, depends on the success of their argument that the pursuit of administrative remedies would be futile in this case.

Plaintiffs assert that "[t]he only issue in this case is that of damages." Plaintiffs' Memorandum at 8. Plaintiffs further argue that exhausting the EAHCA's administrative procedures would be futile since they cannot obtain money damages, the only remedy they seek, through the EAHCA's procedures. The Court of Appeals for the First Circuit has held that it would be improper to permit the granting of general damages for violations of the EAHCA:

> [I]t would be incongruous for Congress to subject school systems to liability for damages each time a court disagreed with the school district's program while at the same time admitting the uncertainty of diagnosis in the field....
>
> [A] general damage remedy would hinder rather than help the very children for whose benefit the statute was enacted.

*Doe v. Brookline School Committee,* 722 F.2d at 920, *quoting Anderson v. Thompson,* 658 F.2d 1205, 1212, 1213 (7th Cir. 1981). In addition, the First Circuit has rejected the awarding of any damages based on a theory that a school district has been "unjustly enriched" as a result of its failure to provide a disabled child with an education. *Hurry v. Jones,* 734 F.2d 879, 884–85 (1st Cir.1984).

The First Circuit has arrived at a quite different result with respect to claims for the reimbursement of educational expenses: "We conclude that permitting re-

imbursement promotes the purpose and policy of the Act.... We therefore hold that reimbursement of tuition and related services is available to the prevailing party under the statutory authority of § 1415(e)(2)." *Doe v. Brookline School Committee*, 722 F.2d at 921, *overruling Doe v. Anrig*, 692 F.2d 800, 812 (1st Cir. 1982). *See also Hurry v. Jones*, 734 F.2d at 884–85. The willingness to permit reimbursement awards is, however, inexorably linked to the exhaustion of the administrative remedies contained in section 1415.[10]

The mostly likely scenario for claims for reimbursement are circumstances in which parents so vigorously disagree with a school district's decision to place their child in a public school that they feel compelled to remove him, at their own expense, to a private educational services provider. *See Town of Burlington v. Department of Education*, 736 F.2d 773, 797 (1st Cir.1984), *aff'd*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). The parents may then choose to initiate the EAHCA's administrative procedures, the purpose of which is to provide an independent review of the school district's decision governing the child's educational placement. The reviewing agency must decide whether the school district was correct in the placement decision it made for the child. But while that review is being undertaken, the child is locked into the private educational placement being paid for by his parents. That result is effected by the "automatic stay" requirement of section 1415(e)(3), which mandates that for the duration of the period in which administrative proceedings are taking place, the child must remain in his current educational placement. 20 U.S.C. § 1415(e)(3).[11]

Thus, while the mandated review is ongoing, the parents are paying for the child's education. The First Circuit has correctly determined that effectuating the central purpose of the EAHCA—guaranteeing a free public education to disabled children—must include permitting a parent who has been forced to pay for educational services *which should have been paid for by the school district* to seek reimbursement for those expenses:

> If the parents are incorrect in their claim that [the school's decision] provides an inappropriate education for that child, they, like any other parents, should bear the financial burden of giving their child a private education. If the school committee's proposed public placement is held inappropriate, then through reimbursement all parties are restored to the position the Act sought to achieve. In turn, "[f]or the successful parent to be left with what should have been the town's bill ab initio does not seem a municipal protection Congress would have intended, however great the shortage of funds."

*Doe v. Brookline School Committee*, 722 F.2d at 921 (footnote and citation omitted). The essential precondition to any decision to award reimbursement to parents is, therefore, a determination, based on educational, psychological, and behavioral criteria, of where a particular child with disabilities should be or should have been placed. That determination must be made through the statutorily prescribed administrative procedures. *See, e.g., Hurry v. Jones*, 734 F.2d at 881–82; *Doe v. Brookline School Committee*, 722 F.2d at 913.

If parents are permitted to circumvent the administrative procedures, courts will be left to determine on their own whether school districts' educational placement decisions are correct or incorrect. There can be no question that this result would undermine the section 1415 administrative scheme. The exhaustion doctrine enables an agency with expertise in an area "to develop a factual record, to apply its expertise to the problem, to exer-

---

**10.** For this reason, the Court does not reach the question of whether reimbursement is available in this case.

**11.** Congress clearly intended, when it enacted this section of the EAHCA, to establish a strong preference, if not an absolute mandate, for the maintenance of the *status quo* until a final decision is reached regarding the child's ultimate placement. *See Doe v. Brookline School Committee*, 722 F.2d at 915.

cise its discretion, and to correct its own mistakes...." *Christopher W. v. Portsmouth School Committee*, 877 F.2d 1089, 1094 (1st Cir.1989). The section 1415 procedures serve precisely these purposes. Congress created a system in which knowledgeable, yet independent, education professionals would be the first line of review for educational placement decisions. If parents believe that this review is unfair or a decision is inequitable, there is recourse to the courts. But Congress made abundantly clear that courts should decide such cases only after a serious and thorough examination of the records of the proceedings undertaken by education professionals and the insights of those experts into the problems of the subject child. 20 U.S.C. § 1415(e)(2). *See also Town of Burlington*, 736 F.2d at 792. Administrative proceedings to assess the propriety of the school district's educational placement decision, and consequently the propriety of reimbursing parents' educational expenses, would not be futile in this case. To the contrary, they are both necessary and specifically required by Congress.

As a result of Plaintiffs' failure to exhaust the available administrative remedies set forth in the EAHCA, this Court is without jurisdiction to proceed on any claims brought under the EAHCA. Accordingly, all of Plaintiffs' EAHCA claims, contained in Counts III and IV, will be dismissed.

### B.

Plaintiffs have also asserted a claim that Craig was expelled from Oxford Hills Junior High School because of his emotional disorder in violation of section 504 of the Rehabilitation Act of 1973 (hereinafter RHA), 29 U.S.C. § 701 *et seq.*[12] Plaintiffs argue that Craig's expulsion denied him the benefits of an educational program in MSAD #17 which is funded, in part, by federal money. In sum, Defendants allegedly failed to provide Craig with the free public education he is entitled to under the EAHCA.

The First Circuit has held that the substantive rights created by the RHA, in cases such as the present case, "derive wholly from the substantive requirements of the EAHCA." *Colin K. by John K. v. Schmidt*, 715 F.2d 1, 9–10 (1st Cir.1983). As a result, plaintiffs may not use the general remedial provisions of the RHA to expand the scope of the remedies which are available under the EAHCA. Plaintiffs may use the RHA only to pursue those remedies available under the EAHCA. In addition, the exhaustion requirements of the EAHCA apply to all claims under the RHA seeking to enforce rights guaranteed by the EAHCA. 20 U.S.C. § 1415(f). Thus, Plaintiffs must exhaust the administrative remedies of the EAHCA before bringing their claim under the RHA to this Court.

Defendants' Motion to Dismiss will be granted with respect to Plaintiffs' claim under the RHA contained in Count V.

### C.

Separate from the alleged violations associated with Craig's expulsion from school, Plaintiffs claim that Defendants "provided the news media with Craig Carey's confidential educational information," thereby purportedly violating the Family Educational Rights to Privacy Act (hereinafter Privacy Act). 20 U.S.C. § 1232g. Complaint at ¶ 82 (Docket No. 1).[13] Defendants' consistent response to this claim, beginning with their Answer, has been to argue that the Privacy Act does not create a right of action for private parties. *See* Answer at 10 (Docket No. 2); Amended

---

**12.** Section 504 reads, in pertinent part:

No otherwise qualified handicapped individual in the United States ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

29 U.S.C. § 794.

**13.** Plaintiffs mistakenly gave the title "Count VI" to two separate counts in the Complaint. The Court will refer to the first "Count VI," which alleges intentional infliction of emotional distress, as "Count VI(A)." The second "Count VI," alleging a violation of the Family Educational Rights to Privacy Act, will be referred to as "Count VI(B)."

Answer at 10 (Docket No. 4); Defendants' Memorandum of Law in Support of Motion to Dismiss and Motion for Summary Judgment at 33–34 (Docket No. 1M). Defendants now argue that Plaintiffs' claims under the Privacy Act should be dismissed. Unfortunately, Plaintiffs have not availed the Court of a response to Defendants' longstanding and well-supported argument[14] for the dismissal of the Privacy Act claim. While Plaintiffs filed a Memorandum of Law and a volume of evidence in opposition to Defendants' Motions, not a word appears in those materials which illuminates this issue.

Local Rule 19(c) is quite clear in requiring that

> [e]very party filing an objection [to a motion] shall file with the objection a separate memorandum of law, in duplicate, including citations of supporting authorities and any affidavits and other documents setting forth or evidencing facts on which the objection is based.

A party who fails to file an objection and an adequate memorandum of law "shall be deemed to have waived objection" to the motion. Local Rule 19(c). Further, this Court has explained plainly and repeatedly that Local Rule 19(c) is not a mere battle of the forms satisfied by general objections:

> The primary purpose of the Local Rules is to ensure the orderly, efficient, and expeditious functioning of the motion practice of the Court.... It is plain that the efficiency sought by the Local Rules requires more than a bare objection, however. Without an explication of the grounds of a party's objection to a pending motion, the Court has no guidance in the resolution of the issue and must devote its limited resources to research

that should have been focused initially by the objecting attorney. The Court's docket is full and its time must be devoted to *resolving issues properly joined before it.* The Court will not, and in fairness to all the parties, cannot do the work of the litigants as well as its own.

*United Transportation Union v. Maine Central Railroad Company,* 107 F.R.D. 383, 383–84 (D.Me.1985) (citations omitted) (emphasis added). The Court of Appeals for the First Circuit has, in another context, arrived at the same conclusion:

> It is settled beyond peradventure that issues mentioned in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.

*Collins v. Marina–Martinez,* 894 F.2d 474, 481 n. 9 (1st Cir.1990).

Plaintiffs have submitted no response, no argument, and no authority on the subject of an implied private right of action under the Privacy Act in the face of a properly asserted and thoroughly argued Motion to Dismiss on that issue. Accordingly, Plaintiffs have waived any objection to Defendants' Motion to Dismiss and the Court will endorse that Motion with respect to Count VI(B).

## V. SECTION 1983 CLAIMS ENFORCING STATE LAW

Plaintiffs claim that Defendants were without statutory authority under state law to expel Craig Carey for possession of a handgun on school grounds. Complaint at ¶¶ 49–53 (Docket No. 1). Plaintiffs further claim that Defendants' alleged failure to observe the mandate contained in 20–A M.R.S.A. section 1001(9)[15]

---

**14.** Defendants cite the following authorities in support of their claim that no private right of action is available under the Privacy Act: *Tarka v. Franklin,* 891 F.2d 102, 105 (5th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1809, 108 L.Ed.2d 940 (1990); *Klein Independent School District v. Mattox,* 830 F.2d 576, 579 (5th Cir. 1987), *cert. denied,* 485 U.S. 1008, 108 S.Ct. 1473, 99 L.Ed.2d 702 (1988); *Fay v. South Colonie Central School District,* 802 F.2d 21, 33 (2d Cir. 1986); *Girardier v. Webster College,* 563 F.2d 1267, 1276–77 (8th Cir.1977); *Martin v. Delaware Law School of Widener University,* 625

F.Supp. 1288, 1302 n. 14 (D.Del.1985), *cert. denied,* — U.S. —, 110 S.Ct. 411, 107 L.Ed.2d 376 (1989); *Smith v. Duquesne University,* 612 F.Supp. 72, 79–80 (W.D.Pa.1985); *Daniel B. v. Wisconsin Department of Public Instruction,* 581 F.Supp. 585, 592 (E.D.Wis.1984), *cert. denied,* 475 U.S. 1083, 106 S.Ct. 1462, 89 L.Ed.2d 719 (1986); *Price v. Young,* 580 F.Supp. 1, 2 (E.D. Ark.1983).

**15.** The relevant text of that provision of Maine law is as follows:

resulted in a deprivation of Craig Carey's civil rights actionable under section 1983. Both parties have offered detailed arguments seeking to explain the relevant statutory language and the import, if any, of the Oxford Hills Junior High School Parent/Student Handbook's provisions governing suspension and expulsion. *See* Oxford Hills Junior High School Parent/Student Handbook at 10–11 (Defendants' Exhibit No. 34). But before the Court may reach the merits of this issue, the threshold question of the propriety of enforcing state law using section 1983 must be addressed.[16]

 Section 1983 claims are valid only against officials who, acting under color of state law, violate either the United States Constitution or a federal statute. *See Baker v. McCollan,* 443 U.S. 137, 146, 99 S.Ct. 2689, 2695–96, 61 L.Ed.2d 433 (1979); *Malachowski v. City of Keene,* 787 F.2d 704, 708 (1st Cir.), *cert. denied,* 479 U.S. 828, 107 S.Ct. 107, 93 L.Ed.2d 56 (1986); *Roy v. City of Augusta,* 712 F.2d 1517, 1522–23 (1st Cir.1983). *See generally Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980) (redefining section 1983's "and laws" phrase to permit claims against state actors for violations of *federal* statutes). This case is quite differ-

ent from other causes of action brought before this Court in which the plaintiffs have asserted that the conduct of school officials violated the federal Constitution. *See, e.g., Klein v. Smith,* 635 F.Supp. 1440 (D.Me.1986); *Stanton by Stanton v. Brunswick School Department,* 577 F.Supp. 1560 (D.Me.1984); *Boynton v. Casey,* 543 F.Supp. 995 (D.Me.1982) (Cyr, J.). In the present case, Plaintiffs argue only that Defendants, in their roles as state actors, violated *state* law.[17] But Section 1983 does not make available to Plaintiffs a federal private right of action for relief from violations of Maine's statutes. Accordingly, Defendants' Motion to Dismiss Count II will be granted.[18]

## VI. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiffs charge that Defendants MSAD #17 and Board of Directors intentionally inflicted emotional distress on Plaintiffs. Plaintiffs also assert claims of intentional infliction of emotional distress against Defendants Adams and Smith, and Defendant Board Members. Defendants respond that the Maine Tort Claims Act, which creates a statutory immunity for governmental entities and governmental employees[19] ac-

---

§ 1001. *Duties of School boards*
School boards shall perform the following duties....
9. *Students expelled or suspended.* They shall expel any student who is deliberately disobedient or deliberately disorderly or for infractions of violence or possession, furnishing or trafficking of any scheduled drug ... after a proper investigation of the student's behavior, and due process, if found necessary for the peace and usefulness of the school....
20–A M.R.S.A. § 1001(9).

16. Neither party submitted arguments to the Court on the availability of a section 1983 claim for violations of state law. Nonetheless, the Court may raise, *sua sponte,* an issue which affects the Court's jurisdiction. *Celli v. Webb,* 696 F.Supp. 738, 739 (D.Me.1988).

17. A suggestion is made in the Complaint that a violation of Craig's constitutional substantive due process rights has occurred. The Court can find no explanation of this assertion independent of the other claims in the Complaint. In the absence of any clear explanation by the Plaintiffs of the specific substantive constitutional right which has been infringed by Defen-

dants, the Court assumes that Plaintiffs rest their arguments on those statutory and constitutional provisions, and common law doctrines, which are specifically cited in their various submissions to the Court.

18. Plaintiffs have not raised a claim under the Maine Civil Rights Act to enforce the state law which Defendants allegedly violated. *See* 5 M.R.S.A. §§ 4681, 4682. Further, Plaintiffs have not asserted any direct private right of action under the relevant state statute, assuming that such a cause of action exists. As a result, there is no valid claim set forth in this Complaint relating to Defendants' alleged violation of 20–A M.R.S.A. section 1001(9).

19. The Maine Tort Claims Act defines a governmental "employee" as:
a person acting on behalf of the governmental entity in any official capacity, whether temporarily or permanently, and whether with or without compensation from local, state or federal funds, including elected or appointed officials.... 14 M.R.S.A. § 8102(1). Defendants Adams, Smith, and Board Members fit easily within this definition and, therefore,

cused of tortious conduct, immunizes these Defendants from liability in these circumstances. 14 M.R.S.A. §§ 8101 et seq. Defendants argue on the grounds of these statutory immunities that Plaintiffs' state tort claims should be dismissed. Before addressing the merits of these claims, the Court must first assess whether there exists a proper jurisdictional basis for addressing Plaintiffs' state tort claims in a federal forum.[20]

The original jurisdictional predicate for bringing these state tort law claims in federal court was the doctrine of pendent jurisdiction. With the disposal of all of Plaintiffs' federal claims, the question must be raised as to whether this Court continues to have jurisdiction over Plaintiffs' claims of intentional infliction of emotional distress. This Court has previously addressed this question with the following exegesis of *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the governing precedent on this point:

> The *Gibbs* doctrine is a confusing amalgam of judicial power and judicial discretion and the United States Supreme Court has never clearly articulated the interrelationship of its competing elements. The doctrine appears to be founded, in the first instance, upon the absence of a federal court's jurisdiction over claims based solely upon state law where (1) the federal court has found to be without merit federal claims to which the state claims are appended in state court, and (2) no independent basis of federal jurisdiction exists with respect to the state claims. *Gibbs*, 383 U.S. at 725, 86 S.Ct. at 1138. On the other hand, even if power, that is jurisdiction, exists over the state-law-based claims, the federal court has the discretionary authority to decline to exercise the jurisdictional power, on the basis, *inter alia*, of considerations of comity, trial convenience, or potential jury confusion. *Id.* at 727, 86 S.Ct. at 1139. The doctrine is predominantly one of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these *are not present* a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them ... [citation omitted]. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a sure-footed reading of applicable law. *Id.* at 726, 86 S.Ct. at 1139 (emphasis added).

> Having said that, however, the [Supreme] Court goes on to say in the very next sentence, 'Certainly, if the federal claims are dismissed *before trial*, even though not insubstantial in a jurisdictional sense, *the state claims should be dismissed as well.*' *Id.* (emphasis added). This latter sentence seems clearly to require dismissal without action on the merits and without any exercise of discretion if all the federal claims in this suit are found to be, short of trial, deficient. This at least appears to be an element of certainty in the *Gibbs* doctrine and leaves no arena for the exercise of this Court's discretion once it has determined that all federal claims, substantial or not, fail.

*Snowden v. Millinocket Regional Hospital*, 727 F.Supp. 701, 709–10 (D.Me.1990) (emphases in original) (footnote omitted).[21]

In the present case, all of Plaintiffs' federal claims will be disposed of prior to trial. Thus, consistent with the above determination of the *Gibbs* mandate,

---

these Defendants may have available to them the absolute personal immunity guaranteed, in certain circumstances, by the Maine Tort Claims Act. *See* 14 M.R.S.A. § 8111.

20. *See* footnote 15 (the Court may raise, *sua sponte*, questions of its own jurisdiction).

21. The Court then went on to hold that,

were the Court free to exercise its discretion on considerations of comity, judicial economy, substantial justice to the parties, and ending a tediously overworked piece of litigation, it would find in favor of the exercise of jurisdiction and enter summary judgment against Plaintiff on these remaining state-law-based claims. *Id.* at 710.

and in the absence of any independent grounds for exercising jurisdiction over these state law claims, this Court is without jurisdiction over Plaintiffs' state law claims and must dismiss the claims without prejudice.

 Even were this Court to exercise discretion on the question of jurisdiction, the Court would decline to reach the merits of Plaintiffs' intentional infliction of emotional distress claims for extremely weighty reasons of comity. The Maine Tort Claims Act, and particularly those sections relating to immunity from liability for governmental employees, have not yet been fully analyzed and interpreted in their present form by the Maine Law Court. Substantial existing questions, including several which may be dispositive in this case, have not yet been answered by the Law Court.[22] This Court would unquestionably transgress against the *Gibbs* mandate to avoid "[n]eedless decisions of state law," were it to attempt to provide answers to these important state law questions. The better course is to dismiss Plaintiffs' state law claims without prejudice, thereby granting Plaintiffs an opportunity to revive this suit, if they can still do so, in the forum best situated to resolve these issues: the state courts of Maine.

Accordingly, Plaintiffs' claims of intentional infliction of emotional distress contained in Counts VI(A) and VII will be dismissed without prejudice with respect to all Defendants.

## ORDER

Pursuant to the foregoing analysis, it is hereby ORDERED that Defendants' Motion to Dismiss Counts II, III, IV, V, and VIII of the Complaint is GRANTED with respect to all Defendants. Defendants' Motion to Dismiss Counts I, VI(A), and VII is hereby DENIED with respect to all Defendants.

It is hereby further ORDERED that Counts VI(A) and VII are DISMISSED WITHOUT PREJUDICE with respect to all Defendants.

It is hereby further ORDERED that Defendants' Motion to Dismiss Count VI(B) is ENDORSED pursuant to Local Rule 19.

It is hereby further ORDERED that Defendants' Motion for Summary Judgment on Count I of the Complaint is GRANTED with respect to all Defendants. Defendants' Motion for Summary Judgment is DENIED in all other respects.

All counts in the Complaint having been disposed of by the above orders, Defendants' Motion to Order Plaintiffs to Submit to Mental Examination and Defendants' Motion to Compel Answers to Interrogatories/Production of Documents are MOOT, and they are hereby DISMISSED.

So ORDERED.

---

**22.** For example, Plaintiffs appear to assume that "bad faith" on the part of a government official in any capacity vitiates any and all immunities provided to that official by 14 M.R.S.A. section 8111. The question is thereby raised whether all of section 8111(1), or just section 8111(1)(E), is qualified by the following phrase contained in section 8111(1)(E): "... provided that such immunity shall not exist in any case in which an employee's actions are found to have been in bad faith." In addition, the term "bad faith" finds no clear definition in the statute, the legislative history, or the interpretive decisions of the Maine Law Court.

Further, the Maine Law Court has not yet decided in the context of the newly revised Maine Tort Claims Act whether superintendents of schools and school principals in circumstances such as these are immune from liability under the Act and, if so, whether their roles are properly classified as "judicial or quasi-judicial," "prosecutorial," or merely "discretionary." Other relevant issues requiring decision by the Maine Law Court may also be raised by this case.