DOE, John a Minor in his own right, Doe, Robert, Doe, Mary John Doe's Parents each in their own right, Doe, John a minor By and Through Robert Doe and Mary Doe John Doe's Parents, Plaintiffs,

v.

EAGLE–UNION COMMUNITY SCHOOL CORPORATION, dismissed per entry of 12/18/98, Wingerter, Robert in his Official Capacities as Eagle–Union Community School Corporation Board Member and Board President, Cravens, Jon in his Official Capacities as Eagle–Union Community School Corporation Board Member and Board Secretary, Curtis, Charles in his Official Capacity as Eagle–Union Community School Corporation Board Member, Krupowicz, James in his Official Capacity as Eagle–Union Community School Corporation Board Member, Roeder, Paula in her Official Capacity as Eagle–Union Community School Corporation Board Member, Hull, Howard in his Official Capacity as Eagle–Union Community School Corporation Superintendent, Armstrong, Teran in her Professional and Individual Capacities, Tillett, Nancy in her Professional and Individual Capacities, The State of Indiana, Reed, Sue Ellen in her Official Capacity as Superintendent of The Indiana Department of Education, Special Education Appeal Board, Dewes, Cynthia in her Official Capacity as Chairman and Member of The Indiana Board of Special Education Appeals, Terrien, Richard L. in his Official Capacity as Indiana Board of Special Education Appeals Member, Quisten, Raymond in his Official Capacity as Indiana Board of Special Education Appeals Member, Defendants.

No. IP 98–1294–C–B/S

United States District Court, S.D. Indiana, Indianapolis Division.

March 30, 2000.

Jack G. Hittle, Church Church Hittle & Antrim, Noblesville, IN, Thomas E. Wheeler II, Bose McKinney & Evans, Indianapolis, IN, for Eagle–Union Community Schools, Jon Cravens, Charles Curtis, James Krupowics, Paula Roeder, Howard Hull, Teran Armstrong, Nancy Tillett.

Kathyryn Symmes Kirk, Deputy Attorney General, Indianapolis, IN, for the State of Indiana, Sue Ellen Reed, Special Education Board, Cynthia Dewes, Richard L. Terrien, Raymond Quisten.

## ENTRY DISCUSSING MOTIONS FOR SUMMARY JUDGMENT

BARKER, Chief Judge.

### I.  Introduction

### A.  Parties and Procedural Posture

Plaintiffs allege that rights secured to them by the Individuals with Disabilities

Education Act ("IDEA"), 20 U.S.C. §§ 1400–1491, by the Rehabilitation Act of 1973, 29 U.S.C. § 794, by the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, as well as by constitutional due process, were violated by the defendants.

The plaintiffs in this action may be usefully designated as Student and Parents, and on occasion to describe the salient events "Student's Mother" is also a term used. In relation to the docket and the pleadings, the Student is Robert Doe, and his parents are Mary Doe, Mother, and John Doe, Father.

There are two groups of defendants in this action, the "School Defendants" and the "State Defendants." The State Defendants are the State of Indiana, Suellen Reed, the Indiana Board of Special Education Appeals ("BSEA"), Cynthia Dewes, Richard L. Therrien, and Raymond Quist. The School Defendants are Eagle–Union Community School Corporation ("Eagle–Union"), Nancy Tillet, Teran Armstrong, Howard Hull, Paula Roeder, James Krupowicz, Charles Curtis, and Robert Wingerter.

The defendant individuals among the School Defendants are members of the Eagle–Union's School Board, except for Howard Hull, who is Superintendent of Eagle–Union, Teran Armstrong, who is the Principal at the high school attended by the Student, and Nancy Tillett, who is a counselor at the high school attended by the Student. The Student has engaged Eagle–Union in litigation in the past in *P.J., a Minor by His Next Friend v. Eagle–Union Community School Corporation*, 1999 WL 1054599 (7th Cir. November 17, 1999) (unpublished) (affirming district court disposition of IDEA and related challenges), and in *A Minor, M.S., by Minor's Next Friend, P.S. v. Eagle–Union*

*Community School Corporation,* 717 N.E.2d 1255 (Ind.App.1999).

The School Defendants and the State Defendants seek resolution of the claims against them through the entry of summary judgment.[1] The plaintiffs oppose such disposition, and likewise seek the entry of summary judgment as to their claims against the School Defendants.

**B. Summary Judgment Standard**

Rule 56(c) of the *Federal Rules of Civil Procedure* provides that a motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute is genuine only if a reasonable jury could find for the nonmoving party. *Id.* Because the plaintiffs are proceeding without counsel, the notice required by *Lewis v. Faulkner*, 689 F.2d 100 (7th Cir.1982), was issued. Through this notice, the plaintiffs were notified of the nature of the motions for summary judgment, of the proper manner in which to respond, and of the consequences of failing to respond. The plaintiffs have responded with evidence and a discussion of their claims.

A party moving for summary judgment initially has the burden of showing the absence of any genuine issue of material fact in evidence of record. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Schroeder v. Barth, Inc.*, 969 F.2d 421, 423 (7th Cir.1992). If the moving party carries this burden, the opposing party then must "go beyond the pleadings" and present specific facts which

---

1. The State Defendants filed a motion to dismiss on March 3, 1999, but in such motion relied on materials outside the pleadings. Their motion to dismiss was therefore converted to a motion for summary judgment in paragraph 5 of the Entry issued on March 31, 1999. The parties were notified of this conversion as required by Rule 12 of the *Federal Rules of Civil Procedure.*

show that a genuine issue exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Scherer v. Rockwell Int'l Corp.,* 975 F.2d 356, 360 (7th Cir.1992).

■ The methodology outlined above applies to the plaintiffs' due process claims, which constitute the entirety of the claims against the State Defendants and a portion of the claims against the School Defendants. A different standard of review, however, is applicable to the residual claims against the School Defendants. A district court reviewing an administrative decision "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). In this setting, when no new evidence is presented,

> "the motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." *Heather S. by Kathy S. v. State of Wisc.,* 125 F.3d 1045, 1052 (7th Cir.1997) (citation omitted). Accordingly, despite being termed summary judgment, the district court's decision is based on the preponderance of the evidence. *See* 20 U.S.C. § 1415(e)(2) (1996); *Hunger v. Leininger,* 15 F.3d 664, 669 (7th Cir.1994). Indeed, a district court must independently determine whether the requirements of the Act have been satisfied. In developing this standard, Congress specifically rejected language which would have made state administrative findings conclusive if supported by substantial evidence. However, because courts do not have special expertise in the area of educational policy, they must give "due weight" to the results of the administrative decisions and should not substitute "their own notions of sound educational policy for those of the school authorities which they review." *Board of Educ. of Murphysboro v. Illinois Bd. of Educ.,* 41

F.3d 1162, 1166 (7th Cir.1994) (citations omitted) (emphasis added); *see Morton Community Unit Sch. Dist. v. J.M.,* 152 F.3d 583, 587–88 (7th Cir.1998) ("'[C]ourts (the district court and then this court, using the same standard) should give due deference to the hearing officers' judgments."); *Heather S.,* 125 F.3d at 1052–53.

*Patricia P. v. Board of Educ. of Oak Park,* 203 F.3d 462, 467 (7th Cir.2000); *see also Board of Educ. of Murphysboro v. Illinois State Bd. of Educ.,* 41 F.3d 1162, 1166 (7th Cir.1994) (in cases challenging administrative decisions under the IDEA, a district court must independently determine whether the IDEA's requirements have been satisfied).

## II. Discussion

### A. Statutory Overviews

The core of the claims and issues in this action is the implementation of the IDEA. Under IDEA, a parent or guardian is entitled to procedural safeguards to ensure that his or her disabled child's educational needs are being met by the student's school district. The following excerpt, though lengthy, sets the stage for an understanding of what occurred in relation to the Student's entitlements and the various defendants' obligations under the IDEA.

> IDEA, known originally as the Education of the Handicapped Act, was enacted to ensure that all children with disabilities have access to a "free appropriate public education" to meet their unique needs. 20 U.S.C. § 1400(c). A "free appropriate public education" is defined as "special education and related services" that (1) have been provided at public expense and under public supervision and direction; (2) meet the standards of the state educational agency; (3) include an appropriate preschool, elementary, or secondary school education in the state involved; and (4) are provided in conformity with the individualized education program required under § 1414(a)(5). *Id.* § 1401(a)(18).

To effectuate this goal, Congress established a three-tiered funding, administration, and implementation scheme, under which the state must submit a plan of compliance to the Secretary of Education which provides federal IDEA funds to the state. *See* 20 U.S.C. §§ 1412–1414. The state is then responsible for administering the funds on the state level, including the distribution of federal funds to local education agencies (LEAs) and the implementation of policies and procedures to ensure that each LEA expends the funds in a manner consistent with the purpose and substantive provisions of IDEA. *See id.* §§ 1413(a), 1414(b). In order to qualify for IDEA funds, each LEA must apply to the state education agency (SEA) and provide certain assurances of compliance with IDEA. *See id.* § 1414(a). The LEA then provides services directly to children with disabilities using the funds obtained from the SEA. *See id.*

A state wishing to receive funding under IDEA must have in effect a policy assuring all children with disabilities a free appropriate public education and establish specific procedures to ensure compliance with IDEA by both state and local education agencies. *See id.* § 1412. More specifically, each state must submit a state plan to the Secretary of Education setting forth, *inter alia:* (1) policies and procedures for ensuring that funds received under IDEA are expended in accordance with its provisions, *see id.* § 1413(a)(1)-(2); (2) a description of programs and procedures for personnel development, *see id.* § 1413(a)(3); (3) policies and procedures to provide for the participation of children in private schools in programs established under IDEA and to provide special education services to children in private schools who are referred to the state for educational services, *see id.* § 1413(a)(4); and (4) procedures for the annual evaluation of the effectiveness of state programs under IDEA, *see id.* § 1413(a)(11). Of particular import to

this litigation is IDEA's directive to the states to establish policies and procedures for developing and implementing interagency agreements between the SEA and other state and local agencies to define the financial responsibility of each agency for the provision of a free appropriate public education to each child with a disability and to resolve interagency disputes. *See id.* § 1413(a)(13).

The LEA, on the other hand, must apply to the state for funds under IDEA. *See* 20 U.S.C. § 1414(a). Section 1414(a) provides that in its application, the LEA must, among other things: (1) provide assurances to the state that payments will be used to pay costs directly attributable to programs implementing the provisions of IDEA, *see id.* § 1414(a)(1); (2) maintain records and furnish information as may be necessary for the state to perform its duties under IDEA, *see id.* § 1414(a)(3); and (3) provide assurances to the state that the LEA will establish or revise an individualized education program for each child with a disability at the beginning of each school year and review its provisions at least annually, *see id.* § 1414(a)(5). In the event that an LEA has no program for a free appropriate public education in place or fails to maintain an existing program, § 1414(d)(1) provides a stopgap measure, ensuring the provision of a free appropriate public education:

> Whenever ... a[n][LEA] ... is unable or unwilling to establish and maintain programs of free appropriate public education which meet the requirements established in subsection (a) ... the [SEA] shall use the payments which would have been available to such [LEA] to provide special education and related services directly to handicapped children residing in the area served by such [LEA].

*Id.* § 1414(d)(1).

Thus, IDEA delegates supervisory authority to the SEA, which is responsible

for administering funds, setting up policies and procedures to ensure local compliance with IDEA, and filling in for the LEA by providing services directly to students in need where the LEA is either unable or unwilling to establish and maintain programs in compliance with IDEA. The LEA, on the other hand, is responsible for the direct provision of services under IDEA, including the development of an individualized education program (IEP) for each disabled student, the expenditure of IDEA funds to establish programs in compliance with IDEA, and the maintenance of records and the supply of information to the SEA as needed to enable the SEA to function effectively in its supervisory role under IDEA.

Although the SEA's role under IDEA is primarily supervisory, § 1412(6) places the ultimate responsibility for the provision of a free appropriate public education to each student on the SEA:

> The State educational agency shall be responsible for assuring that the requirements of this subchapter are carried out and that all educational programs for handicapped children within the State, including all such programs administered by any other State or local agency, will be under the general supervision of the persons responsible for educational programs for handicapped children in the State educational agency and shall meet education standards of the State educational agency. This paragraph shall not be construed to limit the responsibility of agencies other than educational agencies in a State from providing or paying for some or all of the costs of a free appropriate public education to be provided handicapped children in the State.

20 U.S.C. § 1412(6). In addition, the legislative history indicates that § 1412(6) was included in the statute to "assure a single line of responsibility with regard to the education of handi-

capped children." S. REP. NO. 94–168, at 24 (1975). This report states further that while different agencies may deliver services under IDEA, "the responsibility must remain in a central agency overseeing the education of handicapped children, so that failure to deliver services or the violation of the rights of handicapped children is squarely the responsibility of one agency." *Id.*

In addition to its substantive provisions, IDEA also contains a comprehensive set of procedural safeguards to ensure that the parents or guardian of a handicapped child are notified of decisions affecting their child and have an opportunity to contest these decisions. *See* 20 U.S.C. § 1415. Under the procedural provisions of IDEA, any SEA or LEA which receives assistance under IDEA must establish and maintain such procedural safeguards. *See id.* § 1415(a). These safeguards include the right of parents to examine all relevant records with regard to the education of their child, *see id.* § 1415(b)(1)(A); the right to obtain an independent educational evaluation of the child, *see id.;* written prior notice to the parents whenever an agency proposes or refuses to initiate or change the identification, evaluation, or educational placement of the child or the provision of a free appropriate public education to the child, *see id.* § 1415(b)(1)(C); and the opportunity to present complaints with respect to the provision of a free appropriate public education to the child, *see id.* § 1415(b)(1)(E). Once a complaint is received under § 1415(b)(1), the parents have a right to an impartial due process hearing conducted by either the SEA or the LEA. *See id.* § 1415(b)(2). If this hearing is conducted by the LEA, any party aggrieved by the findings and decision may appeal to the SEA which must conduct an impartial review of the hearing and make an independent decision. *See id.* § 1415(c). In addition, at either of these hearings, the parties have the right to be accompanied by

counsel, the right to present evidence, the right to a transcript of the hearing, and the right to written findings of fact and decisions. *See id.* § 1415(d). Finally, any party aggrieved by the decision of the SEA following a hearing under either § 1415(b)(2) or § 1415(c) may file a complaint in a United States district court, and the court "shall grant such relief as the court determines is appropriate." *See id.* § 1415(e).

*Gadsby by Gadsby v. Grasmick,* 109 F.3d 940, 943–44 (4th Cir.1997). The IDEA requires that due process hearings, conducted by independent hearing officers ("IHO") who are not employees of a state or local educational agency, be available for students and parents who disagree with schools about IDEA issues. 20 U.S.C. § 1415(a), (b), and (e); 34 C.F.R. § 300.500 to 300.515. In Indiana, the IDEA administrative process is governed by the Administrative Orders and Procedures Act ("AOPA"), codified at IND.CODE §§ 4–21.5–3–1 *et seq.* and 20–1–6–4; 511 I.A.C. 7–15–5(x) and –6(d). After an IHO rules, an appeal may be taken to the BSEA, which performs IDEA reviews. IND.CODE § 20–1–6–4; 511 I.A.C. 7–15–6.

■ Section 504 of the Rehabilitation Act provides, in pertinent part:

> No otherwise qualified person with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

29 U.S.C. § 794(a). The purpose of the Rehabilitation Act " 'is to prevent old-fashioned and unfounded prejudices against disabled persons from interfering with those individuals' rights to enjoy the same privileges and duties afforded to all United States citizens.' " *Morrison v. Commissioner of Special Servs.,* 1996 WL 684426, at \*3 (E.D.N.Y. Nov.18, 1996) (quoting *Galloway v. Superior Court of District of Columbia,* 816 F.Supp. 12, 20 (D.D.C.

1993)). In order to prove a violation of the Rehabilitation Act, a plaintiff must show that: (1) he is an individual with a disability; (2) he is otherwise qualified to participate in a particular program; (3) he was denied that participation based upon his disability; and (4) the program receives federal funds. *See D'Amico v. City of New York,* 132 F.3d 145, 150 (2nd Cir.), *cert. denied,* 524 U.S. 911, 118 S.Ct. 2075, 141 L.Ed.2d 151 (1998). In cases involving allegations that a disabled student has not received a free and appropriate public education, the line between the Rehabilitation Act and the IDEA is rather blurred. As the Court of Appeals for the Third Circuit has noted:

> While IDEA is phrased in terms of a state's affirmative duty to provide a free, appropriate public education, the Rehabilitation Act is worded as a negative prohibition against disability discrimination in federally funded programs.... There appear to be few differences, if any, between IDEA's affirmative duty and § 504's negative prohibition. Indeed, the regulations implementing § 504 adopt the IDEA language, requiring that schools which receive or benefit from federal financial assistance "shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction." 34 C.F.R. § 104.33(a).

*W.B. v. Matula,* 67 F.3d 484, 492–493 (3d Cir.1995); *cf. Wenger,* 961 F.Supp. at 422 ("Section 504 provides relief from discrimination, whereas the IDEA provides relief from inappropriate educational placement decisions, regardless of discrimination").

The ADA prohibits discrimination against qualified individuals with disabilities, as defined in 42 U.S.C. § 12111(8). The ADA provides, in part:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or

be subjected to discrimination by any such entity.

42 U.S.C. § 12132. The ADA provides a definition of "disability":

The term "disability" means, with respect to an individual—

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). Major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). The ADA adopts the Rehabilitation Act's program accessibility requirements. 28 C.F.R. § 35.103(a).

### B. Administrative Proceedings and Record

At a certain point, the Student was attending Eagle–Union's Zionsville High School (School). As just outlined, through procedures associated with the IDEA, parents can present a complaint regarding "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate education to such child." 20 U.S.C. § 1415(b)(1)(E) (1988). If parents choose, their objections and concerns may be heard at an "impartial due process hearing." 20 U.S.C. § 1415(b)(2) (1988). The Student's Mother made what was treated as such a request when, in a written note dated December 4, 1997. She wrote:

I am requesting an independent hearing officer re: Individuals with Disabilities in Education Act valuation conflict.

This note is addressed to "Atty. Wheeler." Mr. Wheeler was counsel of record for Eagle Union in *P.J., A Minor v. Eagle–Union Community School Corporation,* No. IP97–1144–CT/G.

The Indiana Department of Education received a copy of this note on January 5, 1998. An IHO was appointed on January 6, 1998. An Article 7 due process hearing is a hearing conducted pursuant to the Indiana Administrative Code § 7–15–5(a) ("A parent, a public agency, or the state education agency may initiate a due process hearing regarding: (1) the eligibility of a student for services under this article; (2) the appropriateness of the educational evaluation; (3) the appropriateness of the student's proposed or current program or placement; or (4) any other dispute involving the provision of a free appropriate public education for the student."). In turn, " 'Due process hearing' means a hearing conducted by an independent hearing officer when there is any dispute regarding the provision of a free appropriate public education to a student including, but not limited to, the student's: (1) identification; (2) educational evaluation; (3) proposed or current program or placement; or (4) reimbursement for these provisions." 511 I.A.C. § 7–3–19. The plaintiffs and Eagle–Union were notified of the appointment of an IHO and various other notices and documents were transmitted. The hearing before the IHO lasted five days, occurring in February, March and May of 1998. The IHO issued a decision on June 8, 1998. The plaintiffs then sought review of the IHO's decision by the BSEA, which ruled on July 24, 1998.

The IHO's findings and conclusions, together with a statement of the procedural background to the due process hearing, are set forth on pages 85 through 88 of the administrative record. Although these pages are not sequential, each page is accounted for. The IHO recites, among other things, that the Parents and Student were represented by counsel, as was Eagle–Union, that pre-hearing conferences had been conducted, that the hearing was closed to the public at the Parents' request, that the hearing was conducted at the request of the Parents, and that there were five issues to be addressed.

The hearing officer's findings of fact included the following: the Student was 17 year-old male who was finishing his junior year of high school. On August 27, 1997, a Section 504 conference committee was held, and at that time it was determined that the student was disabled and qualified for Section 504 services. An Alternative Learning Plan was developed, which included 12 intervention strategies. The Student's Mother agreed to this plan. During the early part of the 1997–98 school year the Student received grades of 3 B's and one C, with two incompletes, but by November the Student received one B, with five incompletes. On December 4, 1997, the student's mother requested an Article 7 hearing concerning an evaluation conflict. Sometime prior to December 12, 1997, the Student's Mother made a request for an occupational therapy evaluation. School personnel apparently viewed this request as a request for an initial Article 7 evaluation request. On December 12, 1997, and the School's Principal made a referral for an Article 7 evaluation. The reasons for the evaluation referral were (a) the Mother's request for an evaluation of tremors, (b) the Student's excessive absenteeism, and (c) the Student's lack of academic progress. On December 15, 1997, the high school counselor, who also handled the Student's Section 504 plan, sent a letter to the Student's Mother offering "another Section 504 conference to explore the possibility of homebound instruction for [the Student], since he cannot come to school on a regular basis." The guidance counselor also made the offer due to the Student's failing grades and increasing incompletes. This Section 504 conference was never held.

On December 12 and 19, 1997, a representative of Eagle–Union called the Student's Mother twice for the purpose of scheduling an intake meeting to discuss the evaluation and inform the Parents of the process and their rights. No contact with the Student's Mother resulted from these calls. On January 7, 1998, a representative of Eagle–Union sent a certified letter to the Student's Parents, informing the Parents that there had been a referral for a psychological evaluation and of the need to meet with the Parents concerning procedural safeguards and written permission for the evaluation. Neither Parent ever contacted the supervisor of special education to set up the meeting. In early January 1998, the hearing officer was appointed and after that date the parties never met to discuss the referral for evaluation and procedural safeguards. The parents failed to give written permission for the psychological evaluation, and no psychological evaluation was performed at this time.

No representative of the School requested an Article 7 hearing concerning the parents' refusal to provide written permission for the psychological evaluation of the Student.

During the fall of the 1997–98 school year, the Student tried out for the high school basketball team. Although the Student missed a few try-out sessions, the basketball coach encouraged the Student to try out for the team and permitted the Student to attend additional sessions. The varsity basketball coach was aware of the Student's Section 504 status but not the Student's specific disability, but did not observe at the try-out sessions any handicapping conditions adversely affecting the Student's try-out. The Student's Mother was to provide the coach with information as to the Student's handicap, but failed to do so. The coach had previously coached the Student during his 9th grade year. The varsity basketball coach, in conjunction with his assistant coaches, selected the 24 students for the varsity and junior varsity teams whom he and they believed were most likely to help the team be successful. The coach believed the Student did not have the skills at the level of the 24 students selected for the team, based on his observations, using subjective and objective components, and his past knowledge and experience in coaching basket-

ball. There was no evidence presented by which the hearing officer could evaluate the Student's performance at the try-outs in comparison with the other boys who tried out for the basketball team and who were either selected for the team or cut. Approximately five to seven other students did not make the 24–member varsity and junior varsity basketball team on this occasion. An initial Article 7 evaluation was never done, nor was an Article 7 multi-disciplinary evaluation team ever composed. During the last day of the due process hearing, the School withdrew its request for an Article 7 psychological evaluation of the student and the parties stipulated that the student should be evaluated for occupational therapy as it relates to his § 504 plan.

In his conclusions, the IHO Officer recited the prohibition against discrimination under Section 504 of the Rehabilitation Act of 1973 and the regulations implementing Section 504. The IHO found the Student to be a qualified person with a disability within the meaning of Section 504 regulations because he is of school-age, had been diagnosed with clinical depression and other handicapping conditions, and had been determined by the School to have a disability that requires special education and related aids and services pursuant to 34 C.F.R. § 104.3(j). The IHO further found that in this case the term "otherwise qualified" did not mean that the Student must be selected for the basketball team despite his handicap; it prohibited the non-selection of the Student when the Student had the skills to make the team but was not selected. The Student was given the same opportunity to try out for the high school basketball team as provided to students without disabilities who tried out for the team. The IHO found that the Student was graded in a non-discriminating manner, based on the coach's subjective and on objective criteria, as were the other students who tried out for the basketball team. The hearing officer further found that the letter December 15, 1997 by the guidance counselor was not a threat but

merely offered to reconvene a Section 504 conference and offered possible services with the School for the reasons stated. The IHO found that the Student and his Parents were provided their due process rights pursuant to the regulations for Section 504 and Article 7 in that the due process hearing was held and the students and parents had the right to and did participate therein. The School could have requested an Article 7 hearing concerning the Mother's refusal to give parental permission for the Student's initial Article 7 evaluation, but did not do so. However, the IHO found no violation thereby, based on the School's belief that its request for an Article 7 hearing would exacerbate the situation. As a result of the due process hearing, certain plans were set in motion for the Student to obtain an occupational therapy evaluation. The parties were directed to proceed in accord with that plan. The IHO further provided notice to the parties of their appeal rights to the BSEA.

The plaintiffs appealed the IHO's decision. The BSEA reviewed the IHO's decision, corrected what it found to be errors in the decision, and affirmed that decision. This action followed. *See* 20 U.S.C. § 1415(i)(2)(A).

### C. Claims Against State Defendants

The BSEA is an SEA for purposes of Part B of IDEA, and is therefore responsible for ensuring that the requirements of the statute are carried out and that each educational program for children with disabilities under its general supervision meets its educational standards. The plaintiffs claim that the State Defendants, including the BSEA and its members, erred in various respects from the point at which the Student's Mother penned her December 4, 1997, note requesting an independent hearing officer.

■ Defendant Reed is what was appropriately termed in *Moubry v. Kreb,* 58 F.Supp.2d 1041, 1049 (D.Minn.1999), a "nominal party" whose presence in the action "is purely gratuitous." Reed did not

play any role in the plaintiffs' effort to secure review or relief under the IDEA or any of the other statutes relied on by the plaintiffs here. The defendant members of the BSEA are entitled to absolute immunity for their actions in reviewing the findings and conclusions of the IHO. *Id.* at 1050 (concluding that IHO was entitled to absolute immunity as an adjudicator).

The plaintiffs' attempt to expand the record to show that the decision reached by the BSEA was incorrect is flawed because the materials they offer for this purpose would not have that effect and because the immunity to which the BSEA members are entitled would not be lost even if their decision were found in this or some later stage of juridical review to have been incorrect. *Monticello Sch. Dist. No. 25 v. George L.*, 102 F.3d 895, 901 (7th Cir.1996) (district court is not required to allow all evidence proffered by a plaintiff in an IDEA proceeding).

The court also finds that the BSEA did not "voluntarily expand its SEA jurisdiction into hearing 504 issues." The reference to "504 issues" is a reference to Section 504 of the Rehabilitation Act, which prohibits individuals with a qualified disability from being excluded from federally funded programs or activities solely on the basis of their disability. 29 U.S.C. § 794. In fact, one way to comply with the Rehabilitation Act's requirement of providing a free appropriate public education is to implement an IEP developed in accordance with the IDEA. See 34 C.F.R. § 104.33(b)(2).

The plaintiffs seek to overcome some aspects of the foregoing by challenging the credentials of the BSEA members and the composition of the BSEA. There is no indication that these individuals were not appointed and do not serve in full accord with the purposes of the IDEA and Indiana's implementing statutory and administrative structure. The plaintiffs' attack on their credentials and criticism of the members' deliberation in the Student's case is unwarranted. The court looks here only for due process error. There were no irregularities, procedural or substantive, associated with the review process by the BSEA or with the hearing process of the IHO.

■ The State of Indiana and the BSEA are defendants in this action. They correctly argue that they have been improperly sued. To the extent that the plaintiffs pursue IDEA and Rehabilitation Act claims, these must proceed against the LEA, which in this case is Eagle–Union. *Yamen v. Board of Educ. of the Arlington Cent. Sch. Dist.*, 909 F.Supp. 207, 209 (S.D.N.Y.1996).

The plaintiffs assert due process claims under the familiar 42 U.S.C. § 1983.

■ Section 1983 is not itself a source of substantive rights; instead, it is a means for vindicating federal rights conferred elsewhere. *Livadas v. Bradshaw,* 512 U.S. 107, 132, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994) (citing *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). To state a claim under Section 1983, a plaintiff must allege the violation of a right secured by the Constitution or laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law. *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988).

"The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in property or liberty." *American Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 119 S.Ct. 977, 989, 143 L.Ed.2d 130 (1999) (internal quotation marks omitted). The entire IHO/ BSEA process of findings and review in an IDEA setting is premised on according "due process" in implementing the congressional goal of the IDEA, which is "to assure that all children with disabilities have available to them . . . a free appropriate public education which emphasizes special education and related services de-

signed to meet their unique needs." 20 U.S.C. § 1400(c) (Supp.1999).

As the discussion above demonstrates, there was no due process violation in the course of the BSEA review of the IHO's findings, either in substantive terms or in terms of procedural handling. The plaintiffs' conclusory allegations otherwise are to no avail in stating a claim for relief. *See Hill v. Shobe*, 93 F.3d 418, 421 (7th Cir.1996) (noting that "[a] conclusory allegation of recklessness . . . is insufficient to defeat a motion to dismiss.") (*citing Palda v. General Dynamics Corp.*, 47 F.3d 872, 875 (7th Cir.1995)); *Wenger v. Canastota Cent. Sch. Dist.*, 961 F.Supp. 416, 423 (N.D.N.Y.1997) (broad and conclusory allegations that SED [SEA] has failed to meet its statutory responsibilities do not state a claim under the IDEA). Without a predicate constitutional violation one cannot make out a *prima facie* case under Section 1983. *Juriss v. McGowan*, 957 F.2d 345, 349 n. 1 (7th Cir.1992) (citing *Baker v. McCollan*, 443 U.S. 137, 140, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)).

### D.  Claims Against School Defendants

As a result of the prehearing orders and developments during the course of the due process hearing, two issues were decided–(1) whether the LEA used Article 7 provisions to threaten the Student or the Parents, and (2) whether the LEA prohibited the Student from participating in the School's interscholastic sports program in violation of Section 504 and/or Article 7. Placing these questions in the context of the evidence, the first is related to the December 15, 1997, letter written by counselor Nancy Tillett to the Student's Mother, and the second is related to the non-selection of the Student for the varsity and junior varsity basketball team. The questions for resolution here, therefore, are whether the IHO's determinations on these points, as affirmed by the BSEA, are supported by a preponderance of the evidence and whether the requirements of the IDEA have been satisfied.

■  Other claims, more explicitly connected with IDEA issues, were not preserved for review in this action, nor even properly presented to the IHO, because the Parents never gave permission for the Student's evaluation. Permission for such an evaluation was required, however, for the Parents to pursue an IDEA claim. *Gregory K. v. Longview School Dist.*, 811 F.2d 1307, 1315 (9th Cir.1987) ("If the parents want [the student] to receive special education under the Act, they are obliged to permit such testing").

■  The foregoing takes the IDEA claim right out of this case, and also circumscribes the related Rehabilitation Act and ADA claims. *Charlie F. v. Board of Education of Skokie School Dist. 68*, 98 F.3d 989, 991 (7th Cir.1996) ("[A]ny pupil who wants 'relief that is available under' the IDEA must use the IDEA's administrative system, even if he invokes a different statute.") (quoting 20 U.S.C. § 1415(*l*)). This reasoning leads precisely to the conclusion reached by other courts that a plaintiff must exhaust her administrative remedies under the IDEA before she may raise a claim that Section 504 was violated. 20 U.S.C. § 1415(f); *Carey v. Maine Sch. Admin. Dist. No. 17*, 754 F.Supp. 906, 923 (D.Me.1990); *Waterman v. Marquette–Alger Intermediate Sch. Dist.*, 739 F.Supp. 361, 365 (W.D.Mich. 1990); *Davenport v. Rockbridge County Sch. Bd.*, 658 F.Supp. 132, 133 (W.D.Va. 1987); *Calhoun v. Illinois State Bd. of Educ.*, 550 F.Supp. 796, 802–803 (N.D.Ill. 1982).

■  The issue of whether the Student is a qualified individual for the purpose of Section 504 is settled through the School Defendants' concession and, even more importantly, through the undisputed course of the proceedings with the LEA since August 27, 1997. The Student's Section 504 status was not disputed at that time or since, by either the LEA or the plaintiffs. The School counselor responsible for working with the Student's Section 504 plan was aware of the Student's declining per-

formance during the Fall of the 1997–98 school year. Flexibility in employing the various strategies was certainly essential to maximize the benefit the Student would receive from school, including his academic performance. With the letter of December 15, 1997, Counselor Tillett did no more than state the obvious, which was that homebound schooling for the Student was a possible option. Far from being a threat in any objective sense, the evidence supports the conclusion that the letter of December 15, 1997, was intended to both alert the Student and the Parents to the School's continuing concern for the Student's welfare and progress and propose an additional option in order to bring academic and other aspects of educational success to the Student. A homebound program was not explored by the Parents and the School. It might have been brief or indefinite, partial or complete. It would bring the surrender of certain advantages of the Student being on site, but with the Student's increasing absenteeism a growing problem, there may not have been much loss. These comments, of course, are speculation, but illustrate that the homebound option as referenced in the letter of December 15, 1997, should not properly be construed as a threat.

■ The plaintiffs argue here, as they did in the course of the administrative review by the SEA, that the decision to not place the Student on the School's basketball team was a violation of Section 504. As to this contention, there is little to add to what the IHO found and discussed. The coach of the basketball team testified at the due process hearing. The coach testified that he encouraged the Student to try out, that he permitted the Student to have additional try-out sessions, that he was aware of the Student's Section 504 status but not of the specific conditions which merited that status, that the try-outs presented "a very competitive situation" in which those who tried out "were all close to making the team," that he gave each student who tried out for the team

the same opportunity, that he evaluated each student who tried out on the basis of objective and subjective factors consistent with his past knowledge and experience in coaching basketball, and that he conferred with is assistant coaches in deciding who to keep on the team.

There was no apparent intent on the part of the basketball coach to discriminate against the Student on the basis of the Student's disability. However, the intent to discriminate on such a basis is not a necessary element of a viable claim under Section 504. *McWright v. Alexander,* 982 F.2d 222, 228–29 (7th Cir.1992) (holding that disparate impact claims are cognizable under the Rehabilitation Act). The same is true of a claim under the ADA. *Washington v. Indiana High Sch. Athletic Ass'n, Inc.,* 181 F.3d 840, 846–47 (7th Cir.), *cert. denied,* —— U.S. ——, 120 S.Ct. 579, 145 L.Ed.2d 482 (1999). Nonetheless, *knowledge* of the disability is an essential element, *Stearns v. Board of Educ. for Warren Twp. High School Dist. # 121,* 1999 WL 1044832, *2 (N.D.Ill.1999), and there must have been some causal connection between the disability and the exclusion. *Washington,* 181 F.3d at 848. No evidence supports such a connection between the Student's disability and his not being selected for the basketball team. On the contrary, the greater weight of the evidence, and fairly understood the *only* evidence, shows that there was no causal link between the Student's disability and the decision not to select him for the basketball team. A further impediment to the Student's ADA claim is that the Seventh Circuit Court of Appeals has refused "to define the major life activity of learning in such a way that the Act applies whenever someone wants to play intercollegiate athletics." *Knapp v. Northwestern University,* 101 F.3d 473, 481 (7th Cir.1996). The argument that the Student would have benefitted from a "token" place on the team, meaning as a non-player on the bench, is not one which was sensible to the basketball coach or to this court.

There was no exclusion, denial of benefits, or other discrimination against the Student on the basis of a disability by any program that receives federal financial assistance. 29 U.S.C. § 794. The IHO's rejection of the plaintiffs' Section 504 claims and his findings in relation to those claims were clearly correct on the administrative record. The consequence is that the plaintiffs cannot establish a necessary element of those claims and of the ADA claim, because a motion for summary judgment allows the trial court to resolve cases where the relevant facts are undisputed and there has been a "complete failure of proof concerning an essential element" of the plaintiff's case. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Additionally, because there is no procedural infirmity associated with the Article 7 due process hearing-no violation of a federally secured right apart from the implementation and review of the Section 504 plan for the Student, there is no viable claim under Section 1983 for the same reasons compelling the dismissal of such claim against the State Defendants.

### III. Conclusion

Pointing out that courts have no special expertise in educational policy, the Supreme Court has instructed that the lower courts must give "due weight" to the results of the administrative process, and should not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Board of Educ. of Hendrick Hudson Central School District Westchester County v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). According the administrative proceedings challenged in this action that deference, there was no error whatsoever in the steps leading up to or connected with the due process hearing involving the plaintiffs and their allegations of statutory or constitutional violations. The defendants' motions for summary judgment must therefore be granted, while that of the plaintiffs as to the claims against the State Defendants must be denied.

Judgment consistent with this Entry shall now issue. The costs of this action are assessed against the plaintiffs.

**IT IS SO ORDERED.**